E-FILED
3:18 PM
Clerk, U.S. District Court, ILCD

IN THE DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| LOUIS WOZNIAK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case Number: 15-cv-2275 |
| | ) | |
| ILESANMI ADESIDA, MICHAEL HOGAN, | ) | |
| ROBERT EASTER, LAURA CLOWER, | ) | |
| BARBARA WILSON, CHRISTOPHER | ) | |
| KENNEDY, PHYLLIS WISE, MATTHEW | ) | |
| FINKIN and ERIC JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDAN'S MOTION FOR SUMMARY
JUDGMENT**

NOW COMES Plaintiff LOUIS WOZNIAK in response to defendants,

ILESANMI ADESIDA, MICHAEL HOGAN, ROBERT EASTER, LAURA

CLOWER, BARBARA WILSON, CHRISTOPHER KENNEDY, PHYLLIS WISE,

MATTHEW FINKIN, and ERIC JOHNSON, MOTION FOR SUMMARY

JUDGEMENT ("MOTION") by and through his attorney, Stuart D. Polizzi,

pursuant to Fed. R. Civ. P. 56, and Local Rule 7.1(D), and states as follows:

## I.  INTRODUCTION

Plaintiff, Louis Wozniak (hereinafter "Wozniak") is a former tenured

employee of the University of Illinois (hereinafter "University"). On November 14,

2013, the Board of Trustees of the University revoked Wozniak's tenure and

terminated his employment.

On November 3, 2015, Wozniak filed a three-count complaint against the

Board of Trustees of the University, the then-Chairman of the Board of Trustees,

and various members of the University's administration and faculty seeking equitable relief, damages, and attorney's fees.  Plaintiff alleges that defendants Ilesanmi Adesida (hereinafter "Adesida"), Michael Hogan (hereinafter "Hogan"), Robert Easter (hereinafter "Easter"), Laura Clower (hereinafter "Clower"), Barbara Wilson (hereinafter "Wilson"), Christopher Kennedy (hereinafter "Kennedy"), Phyllis Wise (hereinafter "Wise"), Matthew Finkin (hereinafter "Finkin"), and Eric Johnson (hereinafter "Johnson") violated his right to "free speech" as guaranteed by the First Amendment to the United States Constitution. Plaintiff also alleges under Count II that all defendants, except Finkin, violated his right to due process guaranteed by the Fourteenth Amendment to the Constitution.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The University's discipline of tenured faculty is internally governed by University Statutes and the Academic Staff Handbook in which the faculty play a substantial role in faculty discipline. Johnson Dep. Finkin Dep. Ex. 19, p.38.

2. The University Statutes confer on the CAFT primary responsibility for deciding whether a tenured faculty member's conduct provides "due cause" for dismissal. The Statutes contemplate that the CAFT, in discharging this responsibility, will resolve factual disputes that arise in connection with the President's charges against the faculty member. Article X, § 1(e) provides, for example, that the CAFT shall "make ... explicit findings of fact on each charge." Finkin Dep. Ex. 19

3. The University has subjected Wozniak to severe discipline multiple times over the past twenty years without a hearing. Wozniak Affidavit

4. In 1992, Wozniak openly opposed the reappointment of IESE Department head Tom Conry.  Conry was reappointed notwithstanding a meeting of tenured department members with Schowalter, denigrating Conry's performance as head and

requesting he not be reappointed.  Wozniak Affidavit

5. In 1995, Conry demanded Wozniak's past semester gradebooks (compilation of semester individual grades from which a final course grade is computed) submission for department review, falsely asserting such was a department requirement for all courses. Wozniak Affidavit

6. Having submitted all final course grades as required by the University Faculty Handbook, Wozniak declined Conry's directive.  A majority of students in Wozniak class sided with him in his non-disclosure stand. To compel Wozniak to produce, Conry, through Associate Head Michael Pleck arranged for a student to file an in-department Capricious Grading allegation against Wozniak.  The hearing committee, chaired by Prof. Dan Metzand under agreement of non-disclosure, examined the gradebook, found for Wozniak, and dismissed the charge. Wozniak Affidavit

7. As a result of the incident, Schowalter suspended Wozniak from teaching and relocated his office and line of reporting to him.  He also assigned Wozniak to supervise the college web site, claiming a job reassignment, a task previously relegated to graduate assistants.  Wozniak Affidavit

8. Wozniak grieved that disciplinary action by the University to the Committee on Academic Freedom and Tenure ("CAFT"). Wozniak Affidavit

9. Defendant Finkin served as chairman of the CAFT at that time and stated a deposition that "the Committee on Academic Freedom and Tenure took the position that, "that Wozniak was in effect suspended from his academic duties [for disciplinary reasons when his teaching position was reassigned] and that a suspension required a hearing." Ex. 23, Finkin Dep.  pp. 7, 12. (Emphasis added)

10. After the CAFT issued its decision, then President Stukel agreed that Wozniak was

entitled to a hearing when the University reassigned his teaching position and wrote a letter to Finkin affirming the CAFT's position. Finkin Dep. I (Ex.. 1A)

11. Subsequent to that incident, the University adopted Article IX that provided due process steps required before the University could suspend a tenured faculty included the right to a hearing before the CAFT.  Finkin Dep. I p. 14.

12. Neither Finkin CAFT report nor President Stukel's re-education ended his punitive assignment with near zero pay raises received by Wozniak.  The suspension lasted seven years until the appointment of new dean David Daniel. Wozniak Affidavit

13. In 2002, Dean Daniel reassigned Wozniak to his former teaching duties and office location.  Wozniak Affidavit

14. In 2009, Wozniak questioned the propriety of a student election of a faculty award that was conducted by Gamma Epsilon and Alpha Pi Mu two non-independent University organizations. Complaint Para. 13.

15. The teaching award was based upon a published and advertised student election conducted amongst senior students within the Department of Enterprise and Systems Engineering and was traditionally awarded to the faculty member who had received the most students votes.  Wozniak Affidavit

16. The teaching award at issue was awarded annually but individual award winners only were eligible to receive the award every other year. Wozniak Dep. p. 14

17. Wozniak had won the award twice before the 2009 student election. Wozniak Dep. p. 14

18. The award was publicized by the University at an annual awards banquet and was used by the University to promote the Industrial and Enterprise Systems Engineering Department to alumni, prospective students and contributors who donate to the University.  Wozniak Dep. pp. 137-139, 143-144.

19. Wozniak publicized the findings of his investigation because he believed the students who voted on the award were being cheated out of their voting rights by improper University intervention.  Wozniak Dep. pp. 144-145.

20. Wozniak communicated his views about the University's improper intervention in the teaching award selection process to students, faculty and the public at large through emails and through a website he had created to bring attention to the issue, Illethic.info (later changed to Illethics,com). Complaint Para 22.

21. Wozniak's complaints about the teaching award and the University's action to dismiss him enjoyed substantial media coverage including front page coverage in both the Chicago Tribune and Champaign News Gazette.  Wozniak Dep. pp. 147-148.

22. In April 20, 2009, Wozniak questioned the President of one of the non-University organization honor societies that had conducted the election because he suspected that the University improperly had intervened in determining the winner of that year's award.  Complaint

23. At the time of Wozniak's interview with President A, she was not a student of Professor Wozniak's and was addressed at the meeting with him solely with regards to her position as president of an independent honor society.  Wozniak Dep. pp 149-150.

24. University's own policies makes clear that non-University organizations like Alpha Pi Mu and Gamma Epsilon are not governed by the University.  Wozniak Affidivat

25. President A was not a student of Wozniak's at the time she met him at his office to question her about the fraudulent teaching award election.  Wozniak Dep. pp 169-170.

26. At that open door meeting with Wozniak, President A admitted that Wozniak had won the teaching award election and by email indicated that the University had been directly involved in ensuring that the award given to another faculty member. Wozniak

Affidavit

27. Wozniak subsequently questioned Lynnell Lacey, an IESE administrator as to whether Professor Pang, the department head, had been involved in thwarting the results of the student's election by directing the award to another faculty member. Complaint

28. In response to his inquiry, Ms. Lacey responded "How did you know that." Complaint

29. Following his discovery that the University had been directly involved with altering the election results, Wozniak communicated to students, faculty and members of the public regarding the University's improper intervention to circumvent the student's vote in the teaching award process via email and via the internet. Complaint Para 22

30. Wozniak posted information that he had obtained about the University's improper intercession in the teaching award on a website that he created Illethics.com.

    Complaint Para 22

31.      On March 30, 2010, Defendant Adesida admonished Wozniak for his actions and directed him

> in order to protect against a possible creation of an unproductive educational environment, I'm instructing you to refrain from further involvement of any students and concerns that you may have about the Alpha Pi Mu and Gamma Epsilon teaching award.  Clower Dep. Ex.. 281.

32.     Defendant Clower contributed to the March 30, 2010 letter. (Clower Ex. 280)

33.     In direct response to his actions to publicize the University's improper involvement in the award, Wozniak was subjected to the discipline of reassignment of his teaching duties by Defendant Adesida without hearing in violation of the University Statutes. Complaint Para 17-18

34.     Wozniak grieved the disciplinary action to the CAFT. Finkin

Dep. Ex. 1

35.    On August 13, 2010, Defendant Finkin, then chair of the CAFT emailed Defendant Hogan to inform him that Woniak had grieved his removal as a teacher and that Defendant Adesida "had acknowledged that Wozniak's lawsuit might be protected expression." Ex. 1, Adesida Dep., p. 41 (Adesida Dep. Ex. 1).

36.    At that time and subsequently, Defendant Finkin informed Defendant Hogan that the CAFT saw Wozniak's reassignment as disciplinary action that required the University to abide by University Statutes and reminded him of President's Stukel's affirmation of that position fifteen years earlier. Adesida Dep. pp.  44-48, 52-53, 114

37.    On August 20, 2010, Defendant Hogan communicated to the Board or Trustees including Defendant Kennedy and attached a memo prepared by Defendant Wise regarding Wozniak's "unacceptable behavior" and potential "media coverage" related to his removal by Defendant Adesida from teaching.  Hogan Dep. pp. 59-60; Hogan Dep. Ex.. 1C1.

38.    Wozniak had created a Youtube video in which he communicated his complaint about the teaching award.  See also Clower Dep. pp. 21-22.

39.    On August 24, 2010, Defendants Kennedy and Hogan received a forward of a YouTube video from Defendant Clower. Hogan Dep p. 69; Hogan Dep. Ex.. 1C2.

40.    On August 19, 2010, Gregory Scholz of the AAUP, a national organization that provides guidance in the area of academic standards and discipline wrote to Defendants Easter, Hogan Adesida and Clower in support of the CAFT's position

Under Regulation 7a of the AAUP's Recommended Institutional Regulations on Academic Freedom and Tenure (attached), "a severe sanction, such as suspension from service for a stated period," should be imposed only after the administration has demonstrated adequacy of cause for the sanction in an adjudicative hearing before an elected faculty body.
Adesida Dep. pp. 49-50,

41.     On August 29, 2010, the Champaign News Gazette published an article about Wozniak's removal from teaching duties and his complaint about the University improperly intervening in the teaching award election.  Hogan Dep. pp. 56-58; Hogan Dep. Ex.. 1C1.

42.     Notwithstanding the CAFT and AAUP's complaints that Wozniak's reassignment from teaching required a hearing, Defendants Easter, Hogan and Adesida refused to abide by the Statute and informed the CAFT of their position through a series of emails and letters in 2010.  Finkin Dep. Exs. 7A, 8

43.     Defendant Adesida testified at deposition that he was advised by Defendant Clower throughout this process.  Defendants' privilege log also demonstrates that Defendant Clower was centrally involved in advising Defendants Easter, Hogan an Adesida regarding Wozniak's due process rights including his right to a hearing and his right to an impartial tribunal. Adesida Dep pp. 2, 43, 51, 64; Clower Dep. 280

44.     Wozniak received substantial support from students for acting with integrity and attempting to expose the University for improperly interfering with the student election.  On September 1, 2010, one of Wozniak's students wrote to Chicago Tribune reporter Cohen to complain about the University's suspension of Wozniak for having complained about the University's improper intervention to circumvent the student vote.  Adesida Dep. Ex. 116

45.     On September 30, 2010, the CAFT chaired by Defendant Finkin issued

its decision on Wozniak's grievance that he had been improperly disciplined without

hearing and found that the University had failed to abide by its governing Statutes.

Ex.. 14, Deposition Testimony of Matthew Finkin - Part I, pp. 74-75 (hereafter

"Finkin Dep. I"); Finkin Dep. I (Ex. 7)

     46.    The CAFT decision detailed that the University in its action had

ignored the precedent set in 1996 and the specific adoption of Article IX in response

to the previous incident that made clear that a hearing was required before the

Defendant Adesida reassigned Wozniak's teaching assignment.

47.    The CAFT Report emphasized that a reassignment

> from teaching "in the students' interests" is a devastating indictment of a
> faculty member, its impact is no less devastating if the faculty member
> continues to be assigned nonteaching duties. Applicable AAUP-supported
> standards—if not the USC handbook's provision on suspension—therefore
> called for suspending [the faculty- member] from leaching for such a reason
> only after affording her requisite academic due process, which should have
> included supplying her with a written statement of the charges against her,
> in a considerable specificity, and demonstrating before a duly constituted
> faculty body both that the charges were correct and that they were of a
> gravity that warranted suspending from teaching.

> Finkin Dep Ex. 7, p. 9

48.    The CAFT spoke of the striking similarity between the University's

present action and its reassignment of Wozniak in 1995:

> So, too, here. A reassignment from teaching for "nonprofessional actions" is
> an equally devastating indictment of such magnitude that fairness and
> accuracy require it be heard before a neutral adjudicative body; but the only
> body consulted, the Department's Executive Committee, was composed of
> those who were seeking Professor Wozniak's removal. Finkin Dep. Ex. 7, p.
> 9

     49.    The CAFT also spoke to how substantial the addition of Article X had

been to University governance and to its clear applicability to the present situation:

> The administration's reception of the CAFT report will he dealt with
> below, but the lacunae in the University Statutes, which made the

first Wozniak case so difficult, was dealt with in consequence of that case. The process of adoption of a University Statute is a protracted one: it requires the concurrence of the Faculty Senates at UIUC and UIC, the negotiation of a text acceptable to the administration, and adoption by the Board of Trustees. Alter years of effort. Art. IX. § 6, was added to the Statutes. It allows for the imposition of a severe sanction lesser than dismissal for "Engaging in professional misconduct in the performance of University dudes or academic activities," which sanction expressly includes removal from the classroom. But the rule requires a prior hearing before a faculty hearing body to decide whether that sanction should be imposed. The hearing body's recommendation against the imposition of a sanction is final. Art. IX, § 6(b)(7). … In sum, <u>the statutory gap that made the Issue in the first Wozniak case so vexing was filled by the addition of Art. IX, §6, to deal with just this case</u>: on allegation of professional misconduct or unethical behavior in connection with academic duties that the administration believes to justify the removal of the instructor from instructional responsibilities.  Finkin Dep. Ex. P. 10

50.    The CAFT found

The Dean's argument thus boils down to the claim that key administrators have authority inherent in their office apart from or despite the University Statutes, and that the observance of due process would obstruct valid institutional ends. We maintain that administrators arc bound by the rules, that their power derives from no higher source; and that due process protects the institution and its constituents, not just the accused. As one of the nation's leading constitutional scholars and former president of the American Association of University Professors put it, the assertion of power to act "without a fair hearing—in this instance a hearing according to academic due process—deserves to be called 'arbitrary' and to be despised."
Finkin Dep. Ex. p. 16

51.    Defendant Easter responded to the CAFT and its decision on November 11, 2010 to state the he disagreed that Wozniak had been denied due process notwithstanding his removal from teaching duties without a hearing.  Hogan Dep. pp. 99-101; (Hogan Dep. Ex.. 7A). Defendant Hogan emailed Defendant Easter that same day "Well done Bob" Hogan Dep. p. 102 (Hogan Dep. Ex.. 7E)

52.    Defendant Finkin wrote to Defendants Hogan and Easter on November 15, 2010 to reiterate the CAFT's position and to state

"that Chancellor [Easter's] proposal would repose adjudicative disposition of Professor Wozniak's complaint of unfair, or arbitrary action, in the hands of those who were consulted extensively (according to the Dean) in the process of the very decision that he is challenging.   Ever since Dr. Bonham's case (1610), it scarcely comports with elemental fairness to allow a person to pass in judgment on his own decisions." Hogan Dep. p.104 (Hogan Dep. Ex.. 7B).

53.    Defendant Hogan concurred with Defendant Easter's position with his own letter to the CAFT dated November 30, 2010. Finkin Dep. Ex. 8

54.    On December 3, 2010, Defendant Adesida formed a College Grievance Committee to adjudicate the charges against Wozniak, and ignored the CAFT's decision to initiate either an Article IX or Article X proceeding to determine whether Wozniak could be disciplined for his actions. Adesida Dep. Ex.. 118

55.    On December 11, 2010, at the behest of Wozniak, Defendant Finkin on behalf of the CAFT wrote Defendant Adesida to inquire about the protections to be afforded Wozniak as part of the College Grievance Committee proceeding with regards to 1) the specificity of the charges to be presented to Wozniak; 2) the burden of proof for the proceeding; 3) the availability of cross-examination and the full representation of counsel; and whether a transcript of the proceeding would be kept. Adesida Dep. pp. 65-66 (Adesida Dep. Ex. 11)

56.    On January 5, 2011, Defendant Easter responded to Defendant Finkin's request and informed him that the proposed proceeding would not allow for active participation of Wozniak's counsel or for a transcription of the record. Adesida Dep. pp. 66-67 (Adesida Dep. Ex. 12A).

57.    On February 1, 2011, Defendant Finkin advised Wozniak that the proposed procedures were lacking with regard to the following fundamental due process protections: 1) burden of proof; 2) right of confrontation; 3) preservation of a

full and accurate record; 4) lack of prior of involvement by the adjudicating

committee members.  (Finkin Dep. I pp. 93-94(Finkin Dep. I (Ex.. 12A)

58.     Based upon Defendant Finkin's feedback regarding the propriety of the

propose proceeding, Wozniak chose not to participate in the College Grievance

Committee proceeding.

59.     The College Grievance Committee hearing members included

department members who had been previously consulted with by Defendant Adesida

as to whether Wozniak could be disciplined prior to Defendant Adesida's

reassignment of Wozniak.  Defendant Adesida had consulted with Defendant Clower

as to whether this conflict would be appropriate.

60.     On January 6, 2011, John Pershing of the AAUP contacted Defendant

Hogan regarding Wozniak's teaching reassignment. Hogan Dep. Ex. 8A

61.     On January 21, 2011, Defendants Easter and Hogan met with

John Pershing to discuss the AAUP's concerns about the Wozniak teaching

reassignment.   Hogan Dep. Ex. 8B

62.     On January 18, 2011, Defendant Easter emailed Defendant

Hogan

> that I have learned that two members of the grievance committee that
> were on the college executive committee and were present when Dean
> Adesida consulted the executive committee about his initial decision
> to remove Professor Wozniak from the classroom.  … University
> Counsel [Defendant Clower] that the earlier role should bar the
> individual's involvement in the later proceeding.

Hogan Dep. Ex.. 8B

63.     On January 19, 2011, Defendant Hogan emailed Defendant Easter

"What happened to our plan to get a completely independent (or mostly

independent) committee from outside the college?"  Hogan Dep. p. 112; Hogan Dep.

Ex.. 8B.

64.    On March 10, 2011, the College of Engineering Grievance Committee, including members who had been consulted with Defendant Adesida regarding Wozniak's removal from teaching, held a proceeding in the absence of Wozniak and determined that he should be subject to termination for his actions. Adesida Dep. Ex. 120

65.    The CAFT later commented on the nature of College Grievance Committee proceeding in its own Report issued after hearing issued on January 9 2013

> As the CAFT developed the facts it concluded that what was contemplated was not a hearing in any proper sense at all but rather a "show cause" proceeding with the burden resting on Professor Wozniak to persuade the College's Grievance Committee (it not being at all obvious to the CAFT that any grievance was properly before that committee for it to hear) that he should be returned to teaching. Upon Professor Wozniak's request for advice, the CAFT concluded that he had no obligation to participate in that proceeding, though he was free to do so. The "hearing" proceeded before the College's Grievance Committee without Professor Wozniak's participation.

Adesida Dep. Ex.. 20 pp. 10-11

66.    On May 12, 2011, Defendant Hogan emailed Defendant Easter that he had reviewed the recommendations of the College Grievance Committee report and that delegated Defendant Easter to institute an Article X proceeding against Wozniak.  Hogan Dep. p. 104; Hogan Dep. Ex.. 121A.

67.    The University brought charges against Wozniak under Article X of the University Statute including charges related to his "involvement" with students Wozniak's and dissemination of his complaints related to the teaching award via e-mail and a YouTube video. Clower Dep. p. 37; Clower Dep. Ex.. 274.

68.    These same "charges" were submitted to the BOT at the September 23,

2013 proceeding.  Clower Dep. p. 55.

69.    The CAFT held hearings for four on the matter in which Wozniak and his counsel offered direct evidence and were allowed to cross-examine the University's witnesses. Finkin Dep. Ex.  20 p. 6

70.    On March 28, 2012, Defendant Finkin questioned Defendant Adesida regarding the broad nature of his proscription to Wozniak "QUOTE" and whether such a proscription would impair Wozniak's right to freedom of expression. Defendant Clower also participated in this discussion.  Adesida Dep. Ex.. 122

71.    On January 9, 2013, the CAFT issued its Report dismissing eleven out of twelve charges brought by the University against Wozniak.  Finkin Dep. I (Ex.. 20).

72.    In its Report, the CAFT admonished University Counsel, Defendant Clower, for her repeated attempts to avoid the University's burden to bring specific charges against Wozniak.  Finkin Dep. pp. 71-73, 81-84; Finkin Dep. (Ex. 20).

Q. And there's language in here on the second full paragraph that starts with "due process." Can you tell me what the committee was trying to address related to the hearing in that is subsection?

A. she made blanket charges that conformed to the standards we had to apply to decide what is dismissible, and she conflated those with the notion of the charges — quote, a pattern of repeated unprofessional conduct, close quote, and, quote, failed to establish and maintain appropriate professional boundaries, quote. In other words, she returned this notion that it is enough that one can be found — how would I put it? — as a blanket matter to have been generally a bad person, a bad egg, as a grounds of dismissal without having specific grounds to discharge. We rejected that during the hearing. We rejected it as you see in the -- our reply to her comment.

Q. So the committee found that to be inconsistent with the direction provided under the Article for the sake of presenting charges with specificity.

A. Yes

Q. Yes. This is under--1 guess it's still under the requirement of the charges. It says no charge was made, if you could read that paragraph. A. Yeah, Ms. Clower in the previous page had again simply tracked the statutory standard about that he had been for many years derelict in his university duties. She had not specified what university duties he was derelict in and that's what this responds to.

73.     The CAFT Report criticized the University and Defendant Clower

regarding the lack of specificity of the charges brought against Wozniak in the

University's Statement of Charges (attached to Complaint as Ex.. 3) also Clower

Dep. Ex.. 274

Professor Wozniak and the Hearing Committee were presented with a document containing twenty numbered paragraphs, headed "Allegations," that supplies a narrative of events. The administration's counsel took the position that this narrative conformed to the Statutory requirement of a statement of charges. The Committee disagreed. Accordingly, the Chair ruled that a specific allegation of misconduct had to be charged in order for it to be considered by the Hearing Committee. At points counsel for the administration agreed and specific such acts were asserted as a charge of misconduct. These will be taken up below. But at other points during the hearing, and in an exchange subsequent to the closing of the record, counsel for the administration returned to what the Chair had termed an "atmospheric" theory of Statutory charges. At several such points the Chair inquired of counsel whether the specific act referenced was being asserted as a charge of misconduct. At each such point counsel initially denied that such was necessary, at one point asserting that whether the matter should be considered would be left to the Hearing Committee's judgment. At each such turn the Committee reminded counsel that that is not within the Statutory compass of academic due process contemplated by Art X of the Statutes; and the Chair pressed counsel to state plainly whether the matter was a Statutory charge to be heard.

On the issue of whether Professor Wozniak's initiation of a lawsuit against two former students constituted a charge of misconduct, twice - at the opening of the hearing on January 20, 2012, and on the final hearing day, April 9, 2012 -counsel for the administration was pressed on the issue and declined to assert that the initiation of the lawsuit was alleged as a charge of misconduct, in contrast to the other acts charged that surround or flow from that suit Nonetheless, in post-hearing argument, counsel asserted the lawsuit as a ground of misconduct.

On September 19,2012, the Chair inquired of counsel whether she was amending the charges in this respect and, if so, why it had not been charged

heretofore and had been disclaimed to be such in the course of the hearing. Counsel replied by stating that the narrative of events ("Allegations") - which the Hearing Committee had determined not to constitute a set of Statutory charges - was replete with references to the lawsuit and so need not then expressly be charged. This repeats a position the Hearing committee rejected from the outset of this proceeding and has adhered to throughout. Inasmuch as the administration was well aware of the facts surrounding the lawsuit at the time this proceeding was initiated, twice declined on the record to make the lawsuit a charge, and declined after the hearing's close to move to amend the charges to include it (and to show good cause why it had not been asserted as a charge heretofore), the Hearing Committee holds that the propriety of the initiation of the lawsuit is not an issue before the Committee.

Finkin Dep. I (Ex.. 20, pp. 7-10, 58-60).

74.   Defendant Clower testified at deposition that she presented the exact same allegations to the BOT during Wozniak's 4 hour proceeding on September 23, 2013.  Clower Dep. p. 113.

75.   Following four days of hearing including cross-examination of University witnesses, CAFT found that the University had not proven and that no University policy had been violated for 11 out of 12 charges brought against Wozniak including charges of improper disclosure of student grades; malicious grading; and videotaping his students without their consent among other charges. Finkin Dep. I (Ex.. 20 pp. 55-56)

76.   The CAFT Report also made findings regarding Wozniak's alleged improper involvement or interaction with students regarding the teaching award.

The CAFT Report found that Defendant Adesida's order of March 30, 2010 was "overbroad" and that "[n]o student was placed in the uncomfortable position of being in an interview or personal encounter in which he or she was pressed to manifest agreement or disagreement with Prof. Wozniak" when subjected to Professor Wozniak's emails or Youtube postings regarding his dispute regarding the teaching award.

Finkin Dep. I (Ex. 20, p. 48)

77.   The CAFT Report stated that [Defendant Adesida's] order "was an impermissible interference to Prof. Wozniak's right of expression" and that had been

"no charge of defamation, invasion of privacy, intentional infliction of emotional distress or other wrongful conduct in the content of these messages."  Finkin Dep. I (Ex.. 20 p. 48-49).

78.    The CAFT recommended that Wozniak not be terminated and that that his suspension from teaching, that had now been in place for almost two and one-half years be removed as times served. Finkin Dep. I (Ex.. 20  p. 62)

79.    Defendant Wilson had been attending or organizing "staffing meetings" with University Legal Counsel regarding Wozniak from March 18, 2010 until September 2011.  *see* Ex.. 3, Deposition Testimony of Barbara Wilson, (hereafter "Ex. 3, B. Wilson Dep")(Ex.. 174A)

80.    Defendant Clower began requesting "future meetings" with staff including Defendant Wilson regarding Wozniak beginning March 26, 2010 and continuing into September 2011.  Ex. 3, B. Wilson Dep. Ex. 174A.

81.    Following receipt of the CAFT Report on January 9, 2013, Defendant Clower and Defendant Wilson convened to meet on January 10 2013. Ex. 3, B. Wilson Dep. Ex. 175

82.    On January 24, 2013, Michael Tague, Counsel for Wozniak, complained to the CAFT regarding Defendant Clower serving as an advisor to President Easter after she had previously served as the charging attorney who had brought the University's case before the CAFT.  Johnson Deposition pp. 6-8; Johnson Dep. Ex. 24

83.    On January 25, 2013, Defendant Johnson emailed Defendant Clower regarding the potential conflict regarding her dual roles and provided Clower with a case cite regarding the potential due process issue but was

17

rebuffed by Clower who told him to mind his own business. The CAFT did not further address this issue.   Johnson Dep. Ex.. 67

84.   On January 25, 2013, CAFT member emailed Defendant Johnson regarding why Wozniak had challenged his participation in the Finkin CAFT that oversaw the Wozniak hearing.

85.   Pursuant to Article X, the President's Office must refer charges to the BOT if it seeks to dismiss a tenured faculty member within 30 days of its receipt of the CAFT report.  Finkin Dep Ex. 19

86.   On February 12, 2013, Mr. Wilson emailed Wozniak's counsel to inform him that he had been retained by "the Board of Trustees in connection with proceedings involving your client, Prof. Louis Wozniak." C. Wilson Dep. Ex. 205

87.   Mr. Wilson testified at deposition that he represented not only the BOT but also all other University employees including the President's office and the CAFT.  C. Wilson Dep. pp. 13-16

88.   Neither Mr. Tague nor Wozniak was ever informed prior to Mr. Wilson's deposition that he represented not just the members of the Board of Trustees but also purported to represent the entire University including the Presidents' office, including Defendant Easter and the University as a whole, including Defendants Wise, Wilson, Johnson, Adesida and Clower.  Wozniak Affidavit

89.   In response to a subpoena from Plaintiff demanding Mr. Wilson's engagement letter, Mr. Wilson produced a letter of referral from the University that does not specify the scope of his engagement but rather

merely includes a "RE" line that states "Advice of Representation to the Board of Trustees Concerning Procedural Issues and Related Matters In Connection with a Possible Article X Hearing." Chris Wilson Dep. Ex.. 201.

90.    Mr. Wilson testified at deposition that the general language in the letter of referral coupled with the "Re" line in the referral letter established that he represented the entire University and all of its employees.  Chris Wilson Dep. pp. 12-14

91.    Pursuant to Article X requirements, the President is required to submit a referral letter to the BOT within 30 days of receipt of the CAFT Report. Finkin Dep. Ex. 19

92.    On February 6, 2013 Steve Veazie, University counsel, forwarded "good edits" to the President's referral letter prepared by Chris Wilson.  Chris Wilson Dep. Ex.. 163.

93.    Defendant Easter submitted the referral letter to the BOT on February 8, 2013 to bring an Article X action against Wozniak notwithstanding the CAFT's recommendation against Dismissal.   Chris Wilson Dep. Ex. 137.

94.    Defendant Kennedy testified at deposition that Chris Wilson attended every BOT meeting in 2013 until November 14, 2013 Kennedy Deposition p. 98; Chris Wilson Dep. Ex.. 210

95.    In February 2013 Defendant Clower and Defendant Wilson reviewed Wozniak's website and determined that it was in violation of FERPA and University policies.

96.    In February 2013, Defendant Wilson reported directly to

Defendant Adesida at that time.  Wise Dep. p. 21.

97.    On February 13, 2013, Defendant Wilson wrote Wozniak complaining that his website, www.illethics.info, disclosed personally identifiable student information that violated federal law (FERPA) and University policy but did not identify any specific documents or the actual policies that she purported to be in violation.  Chris Wilson Dep. Ex.. 211.

98.    Defendant Wilson testified at deposition that the source she had relied upon regarding Wozniak's dissemination of emails identified in her February 13, 2013 that was allegedly violative of University policies and FERPA was none other than Defendant Clower.  Ex. 3, B. Wilson Dep., p. 25.

99.    On February 15, 2013, Wozniak responded to Defendant Wilson's February 13, 2013 letter and stated that the information on his website (student emails, etc.) was of the same nature as the information disseminated by the University to the public in its own 2009 Student Registry and requested specific details as to what information the University was complaining about.  Wozniak Dep. pp. 168-171.

100.    At deposition Defendant Wilson testified that Wozniak's assertions that the University directory at that time included information related to student's names and phone numbers was accurate.  Ex. 3, B. Wilson Dep., p. 33.

101.    In February 2013, Defendant Wilson reported directly to Defendant Adesida. Ex. 3, B. Wilson Dep., p. 35.

102.    Defendant Wilson testified at deposition that In February 2013 at the time she was sending letter to Wozniak that Defendant Clower and

her were analyzing Wozniak's website.  Ex. 3, B. Wilson Dep., p. 36.

103.   Defendant Wilson did not assert at deposition that Wozniak's disclosures of President A's emotional reaction was violative of FERPA but instead testified such a determination was "problematic."  Ex. 3, B. Wilson Dep., p. 40.

104.   Defendants Wilson and Clower agreed at deposition that the website contained a substantial volume of documents. Clower Dep. p. 8; Ex. 3, B. Wilson Dep., p. 47.

105.   On February 19, 2013, Thomas Hardy, the University's emailed BOT Chairman Kennedy, Defendant Easter and Chris Wilson to alert them about a Champaign News Gazette article that had been published in which faculty had expressed concern regarding the Administration seeking dismissal of Wozniak notwithstanding the CAFT recommendation not to terminate.  Chris Wilson Dep. Ex. 134.

106.   On February 22, 2013, counsel for Wozniak wrote to Mr. Wilson to request information regarding the nature of the proceedings before the BOT, the witnesses to be presented, and complained that Defendant Clower's position as advisor to the President was an improper conflict given her previous role s University counsel bringing charges against Wozniak before CAFT.  Chris Wilson Dep. Ex.. 208; Clower Dep. p. 68.

107.  On February 25, 2013, Defendant Wilson wrote Wozniak alleging that his website, www.illethics.info, disclosed personally identifiable student information and provided general information regarding purported examples of improper disclosures.  B. Wilson Ex. 138A

108.  On February 27, 2013, prior to receiving Wozniak's response to her February 25, 2013 letter, Defendant Wilson wrote a letter to Defendant Wise recommending that Wozniak's disclosures on his website should be included amongst the charges in the pending Article X proceeding before the BOT. Ex. 3, B. Wilson Dep., (Ex.. 140).

109.  Defendant Wilson's February 27, 2013 letter stated that Wozniak had posted a video on his website as further evidence that his disclosures should be presented before the BOT.  At deposition, Defendant Wilson testified that the posted video was about Wozniak talking about the incident in which he was denied the teaching award.  Ex. 3, B. Wilson Dep., pp.43-44 and Ex.. 140.

110.  Defendant Wilson testified that Defendant Clower was one of the individuals who had determined that Wozniak had violated University policy by disclosing personally identifiable information on his website. Ex. 3, B. Wilson Dep. p. 25.

111.  On February 27, 2013, Defendant Clower emailed Defendant Wise.  That same day, Defendant Wilson sent Defendant Wise her letter recommending that information from Wozniak's website be presented to Defendant Easter with regards to Wozniak's pending Article X proceeding. Defendant Wise requested that these communications be placed in the "folder for the BOT meeting" so that she might "be ready for any executive session that might occur."  Chris Wilson Dep. Ex.. 209.

112.  Defendant Wilson testified that she did not review Wozniak's website after sending her letters in February 2013 and would not have been

aware if he had redacted any allegedly offensive material after receipt of her letters.  Ex. 3, B. Wilson Dep., p. 51.

113.   Defendant Wilson stated that she not aware of Wozniak ever being charged with having violated FERPA.  Ex. 3, B. Wilson Dep., p. 51.

114.   On March 1, 2013, Defendant Wise recommended that Wozniak's Article X proceeding before the BOT should include allegations related to the findings of Defendant Wilson.  Wise Dep. Ex. 143

115.   Notwithstanding Defendant Wilson's assertions that Wozniak's website included personally identifiable information in violation of FERPA, Defendant Wise never once was shown how any of the purported web postings were violative of FERPA.  Wise Dep. p. 22

116.   On March 1, 2013, Defendant Wise emailed Defendant Easter forwarding Defendant Wilson's February 27, 2013 letter.  In her email Defendant Wise stated that "I completely agree with the recommendations based upon her assessment of his recent actions."  Wise Dep. pp. 36-37; Wise Dep. Ex.. 143.

117.   On March 4, 2013, Defendant Easter emailed Peg O'Donoghue and stated "could you please work with Laura Clower to determine if the appropriate next step is to remand this to the campus for review by the UIUC Faculty Advisory Council and the CAFT?"  Wise Dep. Ex.. 143.

118.   On March 6, 2013 Defendant Easter wrote Defendant Wise to state that he had reviewed Defendant Wilson's report and recommendations and that this warrants consideration of "additional charges under Article X."  Wise Dep. Ex.. 143.

119.    On March 7, 2013, Defendants Wilson, Clower and Wise met with University counsel Steve Veazie from 8:30 a.m. to 9:30 a.m. to discuss "next steps."   Ex. 3, B. Wilson Dep., (Ex.. 176)

120.    That same day, the BOT held a meeting in Champaign-Urbana, Illinois that would have been attended by Defendants Wise and Easter and Chris Wilson.  Kennedy Dep. p. 54; Kennedy Dep. Ex.. 210.

121.    On March 28, 2013 and again on April 3, 2013, counsel for Wozniak again wrote to Mr. Wilson to request information regarding the nature of the proceedings having not received a response to his prior communication.   Mr. Tague suggested that the BOT should institute proceedings consistent with AAUP standards for the BOT proceeding.  Chris Wilson Dep. Ex..s 212, 213.

122.    Defendant Kennedy testified at deposition that he received a number of letters in support of Wozniak.  Kennedy Dep. p. 87.

123.    Defendant Wise testified at deposition that she did not provide notice to Wozniak that Wozniak was being charged with his actions after the issuance of the CAFT report nor was she ware of Defendant Easter providing notice of such charges.  Wise Dep. p. 45.

124.    On April 16, 2013, Chris Wilson emailed University Counsel Steve Veazie with a copy to Defendant Easter related to a letter sent by Defendant Wise.  At that time, Mr. Wilson suggested that he and Veazie discuss "next steps".  Chris Wilson Dep. Ex.. 217.

125.    On April 16, 2013, Defendants' privilege log indicates that Christopher Wilson emailed University Counsel Steve Veazie and Tom

Bearrow regarding "Dr Wozniak's violation of the CAFT Report" and "deciding whether to return to CAFT or proceed to Board of Trustees" and that Christopher Wilson, Veazie and Bearrows were emailed by O'Donoghue to schedule a meeting with Defendant Easter copied on the email. Clower Dep. Ex 280A p. 115

126.   On April 18, 2013, Chris Wilson and Steve Veazie exchanged emails in which Veazie stated that he "had just spoken with Laura Clower" and had learned that 4 hours had been to the allotted to the BOT proceeding. In that email, Veazie provided recommendations as to how the BOT proceeding should be conducted. In that exchange, Chris Wilson agreed with Veazie and offered to write to Tague and Wozniak regarding the September 23, 2013 date and to take responsibility for responding to Tague and Wozniak generally.  Chris Wilson Dep. Ex.. 218.

127.   On April 30, 2013, Susan Kies, Secretary for the BOT, emailed the University of Illinois Board of Trustees, including Defendant Kennedy with a copy to Chris Wilson and Defendant Easter that the Wozniak BOT proceeding had been scheduled for September 23, 2013 from 8:0O a.m. until noon. Kennedy Dep. Ex 266

128.   On May 7, 2013, Chris Wilson wrote Wozniak's counsel to tell him that "the time, date and location are still being determined by the Board." Mr. Wilson also stated that "as to the conduct of the hearing itself, the Board is still considering the appropriate procedures for such a hearing." C. Wilson Dep. Ex. 220

129.   On May 13, 2013, Wozniak's counsel again wrote Chris Wilson

encouraging the Board to adopt AAUP standards for the BOT Proceeding.
Chris Wilson Dep. Ex.. 221

130.   On May 17, 2013, Wozniak's counsel emailed Defendants
Finkin and Johnson regarding his concerns that the absence of any identified
procedures and issues to be heard at the BOT proceeding. Chris Wilson Ex..
222

131.   On July 19, 2013, five months after Defendant Easter had
initiated Article X proceedings against Wozniak and four months after
Wozniak's counsel requested feedback regarding the nature of the
proceedings, Chris Wilson wrote to Wozniak's counsel providing him with
the proposed pretrial schedule and allotment of time for the BOT proceeding
which allowed Wozniak 40 minutes to present evidence in support of his
defense.  Christopher Wilson Dep. Ex.. 215.

132.   Wozniak's counsel later filed a motion to object to the
procedures in place before the BOT proceeding including Wozniak being
limited to just 40 minutes to present his defense before the BOT.  Defendant
Kennedy testified that he could not recall Wozniak's motion regarding the
BOT procedures.  Chris Wilson Dep. Ex.. 240.

133.   On July 26, 2013, Defendant Johnson emailed Joyce Tolliver,
William Maher and Tollier, Maher and Prasanta Kalita in two emails and
stated:

> I wanted to add one more thing in connection with Matt's
> comments. During our meeting, Matt mentioned that the president's
> actions in the Wozniak case were at odds with the AAUP's statement
> on shared governance. After our meeting, I looked at the AAUP
> statement and was surprised to what degree it bears directly on the
> Wozniak case. It says, as you'd expect, that "Faculty status and

related matters are primarily a faculty responsibility; this area includes appointments, reappointments, decisions not to reappoint, promotions, the granting of tenure, and dismissal." But it also says, very specifically, that "the governing board and president should, on questions of faculty status, as in other matters where the faculty has primary responsibility, concur with the faculty judgment except in rare instances and for compelling reasons which should be stated in detail." In the Wozniak case, the administration hasn't yet stated its reasons for rejecting the faculty's judgment, in detail or otherwise.

Also on the subject of shared governance, Matt expressed concern about the administration's handling of the Wozniak case. As you know, the administration filed charges against Wozniak with CAFT, seeking to have him dismissed. Last January, after a lengthy hearing, CAFT unanimously concluded that Wozniak's misconduct was not serious enough to warrant dismissal. The president rejected the CAFT'S recommendation and presented the charges to the Board of Trustees, In presenting the charges to the board, however, the president did not say in what respects he disagreed with CAFT's findings and recommendations. Nor, for that matter, has the president communicated with CAFT at all about the case. The board is scheduled to hear the charges against Wozniak on September 23 and, under the statutes, a representative of CAFT must be permitted to make a statement to the board. So far, though, neither the president nor the board has communicated with CAR or invited s representative of CAFT to be present

Johnson Deposition Ex.. 63

134.   On July 31, 2013, Defendant Johnson emailed his fellow CAFT members expressing his concerns regarding the Administration's failure to notify the CAFT regarding the upcoming BOT proceeding.   Defendant Johnson testified at deposition that he was concerned that the Administration was circumventing the CAFT's primary role in adjudicating the revocation of tenured faculty members and had failed to keep the CAFT in the loop regarding the Article X proceeding against Wozniak.  Johnson Dep. pp. 25-28; Johnson Dep. Ex.. 71

135.   Defendant Johnson and fellow CAFT members questioned whether the Administration could bring "new charges" against Wozniak

without first adjudicating these "new charges" before another CAFT panel. Johnson Dep. Ex.. 64

136.   On August 2, 2013, University counsel Tom Bearrows emailed Chris Wilson regarding contacting Defendant Johnson.   Clower Dep. Ex.. 280A p. 118

137.   On August 7, 2013, Defendant Johnson emailed his fellow CAFT members to tell them that he had been contacted by Chris Wilson. Chris Wilson Dep. Ex.. 229.

138.   On August 8, 2013, Steve Veazie emailed Chris Wilson regarding Defendant Johnson's request to speak with Defendant Easter. Clower Dep. Ex.. 280A p. 118

139.   On August 14, 2013, the Defendant Clower submitted the President's Statement in Support of Dismissal to be submitted to the BOT. Clower Dep. Ex 174

140.   On August 16, 2013, Defendant Johnson emailed Nick Burbules and Joyce Tolliver expressing concerns regarding the President's Statement in Support of Dismissal to be presented at the BOT proceeding that attacked the CAFT and denigrated the CAFT report and disrespected the CAFT. Defendant Johnson stated that if the President refused to withdraw his statement that Johnson would use a majority of the fifteen minutes allotted to the CAFT at the BOT proceeding to complain about how the President's Statement disrespected shared governance rather than to testify how "Professor Wozniak deserves to be dismissed by failing to comply with the conditions imposed by the order."   Chris Wilson Dep. Ex.. 229

141.   On August 19, 2013, Defendant Johnson and fellow CAFT members exchanged emails regarding the President's Statement.   CAFT member Melody Allison stated:

> The President's statement is laced with statements that x y z happened without question and compelling evidence.   The Wozniak CAFT report described these same events in more measured terms "no direct evidence to support or deny".  "no clear and convincing evidence that" .. and provides a detailed accounting of what evidence that CAFT had of the event the conclusions are based. After comparing the two versions, the CAFT report it makes me question what more there is to the President's statement that are not represented.
>
> ….
>
> Also as other CAFT members have noted, the yellow highlighted comments about CAFT are troubling.  It seems to say that CAFT reports will be used when they agree with the President/Board but are flawed and will not be given due consideration when they not.  This does not sound like shared governance.

Johnson Dep. Ex.. 89.

Defendant Johnson responded to Allison and called into question whether the BOT could give proper consideration to any new charges brought before it in the mere four hour timeframe that had been allotted for the BOT proceeding.

> Thanks, Melody, Those are very nice points. In effect, the president's statement challenges the CAFTs very careful factual findings on issues that were actively disputed at the' hearing. What's particularly strange about this is that the president can't possibly suppose that the Board of Trustees will be in a position to rehear and reweigh the evidence. The board (presumably after consulting with the president) set aside only four hours to hear the case, so it obviously won't be hearing testimony from the witnesses who testified at the CAFT hearing.

Johnson Deposition Ex.. 64

142.   Defendant Johnson testified at deposition that "the amount of information presented at the original CAFT hearing was very extensive" and

that in his "view four hours would not be enough time to present all the evidence in relation to the allegations that Ms. Clower was making." Johnson Dep. Ex. 91

143.   On August 21, 2013, Chris Wilson emailed Defendant Easter regarding the outline of a meeting with Defendant Johnson. Clower Dep. Ex.. 280A p. 118

144.   On August 22, 2013, Chris Wilson brokered a meeting between Defendant Johnson and Defendant Easter in which Defendant Johnson communicated the CAFT's concerns to Defendant Easter.  Chris Wilson Dep. Ex.. 237.

145.   On August 29, 2013, Defendant Johnson emailed the CAFT to inform them that he and Chris Wilson had worked together on August 23, 2013, "to identify those portions of the Statement that were particularly troubling to the CAFT".  In that same email, Defendant Johnson informed the CAFT that the President's office had submitted a "revised statement" and shared the statement with the CAFT. ITE

146.   On August 30, 2013, Defendant Johnson emailed Chris Wilson that he had read the "revised" statement and that he was "very pleased" with the revisions and "thanked [Wilson] for all of your help on this" and asked Wilson to convey his gratitude to Defendant Easter.  Mr. Wilson then forwarded Johnsons email to University Counsel Veazie who forwarded it to the President's office.  Chris Wilson Dep. Ex.. 7.

147.   On August 29, 2013, Defendant Johnson shared a redline version of the modified President's Trial Brief with his fellow CAFT

members. Johnson Dep. Ex. 95

148.   The redlined version of the President's Statement.   Chris Wilson Dep. Ex.. 239.

149.   Defendant Johnson was congratulated for his "negotiating" by CAFT member Matthew Stewart

> Well done, Eric
> I think you've done a fantastic job of negotiating this situation over the past few weeks Matt

> Johnson Dep. Ex.. 64

150.        On September 6, 2013, Defendant Johnson met with CAFT members, except Allison.  Johnson Dep. Ex.. 99

151.   Subsequently, Defendant Johnson submitted the CAFT's report that barely mentioned that the Finkin CAFT had found against the Administration on eleven out of twelve charges. Johnson Dep. Ex. 105

152.   Defendant Johnson and his CAFT never determined whether the "new charges" presented by the Administration proved that Wozniak had violated the Finkin CAFT's directive. Johnson Dep. p.  132

153.   Instead as detailed Defendant Johnson's CAFT presentation, the CAFT left it to the BOT to make the factual finding as to whether sufficient evidence existed to prove any of the "new charges" presented against Wozniak subsequent to issuance of the January 9, 2013 CAFT Report.  Johnson Dep. Ex. 105

154.   Defendant Johnson's submission to the BOT included the following rationale:

> The University Statutes confer on the CAFT primary responsibility

for deciding whether a tenured faculty member's conduct provides "due cause" for dismissal. The statutes contemplate that the <u>CAFT, in discharging this responsibility, will resolve factual disputes that arise in connection with the President's charges against the faculty member</u>. Article X, § 1(e) provides, for example, that the CAFT <u>shall</u> "<u>make ... explicit findings of fact on each charge</u>." It also provides that these findings of fact will be given "due consideration" by the Board. These statutes might plausibly be interpreted to require CAFT to resolve in the first instance the factual question whether Wozniak actually violated die conditions imposed by the CAFT in its January 2013 report.

Under the unique circumstances of this case, however, an alternative interpretation also is plausible. In its January 2013 report, the CAFT said that "Prof. Wozniak's failure or refusal to comply with either of die two ... conditions shall be cause to dismiss him." This language strongly suggests dial CAFT did not intend to require the President to file new charges in the event that Wozniak violated the report's conditions. This interpretation of the CAFT's directive also makes sense as a practical matter. By deciding in advance that a violation of the conditions would justify Wozniak's dismissal, the CAFT already had resolved the difficult, value-laden question whether a violation of the hearing committee's conditions would amount to "due cause" for dismissal. What the CAFT left for the President and the Board was the purely factual determination whether Wozniak actually had violated these conditions.

155.  Defendant Clower presented the same allegations to the BOT that she presented before the CAFT that had been rejected by the CAFT as lacking in specificity and which she had refused to identify as charges before the CAFT.  Defendant Clower also presented allegations before the BOT that were 20 years old and had been wholly rejected by the CAFT as having any merit as charges before CAFT.  Clower Dep. pp. 55-59.

156.  In addition, Defendant Clower brought allegations against Wozniak before the BOT related to his postings that were allegedly violative of FERPA or University Policy. Defendant provide the BOT a list of exemplars totaling 65 alleged policy or FERPA violations but did not specify to Wozniak which policy each exemplar supposedly violated.  Defendant

Clower merely included a packet of alleged authorities to the BOT.  Wozniak Affidavit

157.    Defendant Wilson testified before the BOT regarding Wozniak's alleged violations related to postings on his website Exemplars??

158.    Defendant Wilson testified at deposition testifies that disclosure of student emails would not be FERPA violations notwithstanding the fact that the exemplar list presented to the BOT indicates that disclosed student emails were FERPA violations.   B. Wilson Dep., p. 61; Compare Clower Dep. Ex.. 32.

159.    Defendant Clower testified at deposition that

The name of a student A. The name of a student as a student, or their University e-mail address, as long as they have not suppressed their directory information, is not itself protected information under FERPA."

 "Student names and emails fall within the definition of directory information."
Clower Dep. pp. 80, 82-83

160.    The University's Students Grades Privacy and Federal Law that was included in the packet of authorities provided to the BOT states that "Part of any educational record includes defined "directory information" that may be disclosed without specific permission."  Clower Dep. Ex.. 50

161.    Clower testified that she would have been involved in determining whether the charges identified in the list of exemplars were FERPA violations.  Clower Dep. p. 150.

162.    At the BOT proceeding, Wozniak faced 65 new charges in the list of the exemplars to address despite having just 40 minutes to present his defense. Clower Dep. pp. 145-147

163.   Barbara Wilson was presented with the list of exemplars at deposition and testified examples on the exemplar list were not violations of FERPA.  B. Wilson Dep., p. 61

164.   Defendant Kennedy testified that the BOT deliberated but rendered no decision on September 23, 2013.  Kennedy further testified that the BOT did not decide the matter until November 14, 2013.  Defendant Kennedy further testified that the BOT did not discuss the Wozniak matter after September 23, 2013 until they met again on November 14, 2013. Kennedy Dep. p.  116.

165.   Defendant Kennedy testified that he did not recall whether he had read any of Defendant Wilson's letters related to Wozniak's postings to his website. Kennedy Dep. p.  112.

166.   On November 14, 2013, the BOT decision was issued terminating Wozniak.  The BOT Report which is 17 pages in length was released the same day as the BOT meeting. Kennedy Dep. Ex.. 277.

167.   Defendant Kennedy testified that the BOT did not "put pen to paper" or draft the BOT Report.  Kennedy Dep p. 116.

168.   Chris Wilson refused to answer at deposition on the grounds of purported privilege whether he authored the BOT Report but billed more than 90 hours on the engagement between September 23, 2013 and the November 14, 2013 meeting.  Wilson billed only 5.8 hours on November 14, 2013 on the engagement.  Chris Wilson Dep. Ex.. 202.

169.   Defendant Kennedy testified that the BOT was "keenly aware" of First Amendment issues when it rendered its decision to revoke Wozniak's

170.   Wozniak requested a copy of the CAFT Report via a FOIA request.  The University produced the CAFT report without redacting the fact that the student had cried- the very same information for which it eventually revoked his tenure.  See Pl. EX. 2 Pl. Ex. 2A. Wozniak Dep. pp. 172-174.

171.   FOIA rules provide that information may be redacted for privacy 140/7(1)(a) that exempts from disclosure "Information specifically prohibited from disclosure by federal or State law or rules and regulations implementing under federal or State law." Specifically, the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. §1232g) protects the privacy of student education records and prohibits the release of any information from a student's education record without the consent of the eligible student.  140/7(1)(c) exempts from disclosure "Personal information contained within public records, the disclosure of which, if disclosed, would constitute a clearly unwarranted invasion of personal privacy, unless the disclosure is consented to in writing by the individual subjects of the information." This includes personal information.   The University has utilized that exemption extensively in its production of FOIA documents but failed to do so in producing the very CAFT report that was at issue in Wozniak's termination. Pl. Ex. 3

172.       In 2017, Wozniak made a FOIA request to the University to obtain a copy of the CAFT report.  Pursuant to FOIA rules, the University may redact information produced via FOIA requests to preserve the privacy of individuals and to protect information that is otherwise protected under

FERPA. PL. EX2; Pl. Ex 2A. Notwithstanding, these exemptions, which the University has employed continuously to redact Plaintiff's many FOIA productions, its FOIA production of the CAFT report included the very same references to her identity ("President of Gamma Epsilon" p. 24), her educational record ("valedictorian" of her high school class p. 12, 24) and her emotional state ("broke into tears and cried several times" p. 14) which was at the heart of the University's statement of charges against Wozniak and the basis for his termination. Pl. EX. 2, Pl. EX 2A

173.     The BOT's meetings are subject to the Open Meetings Act and are publicly available on the internet. Kennedy Dep. p. 49. For unexplained reasons, two BOT meetings, the first on October 23, 2009 and the second on June 11, 2010, were no longer publicly available as of February 22, 2011 that had been available to the public previously. Compare Kennedy Dep. Ex.. 256; Kennedy Dep. Ex.. 210.

## ARGUMENT

Defendants bring this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1(D). Fed.R.Civ.P. provides, "a party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In support of this Response to Defendants' Motion for Summary Judgment, Plaintiff uses all the same Ex..s filed with the court in Defendants' Motion and

incorporated herein by reference: Deposition of Ilesanmi Adesida (Adesida Dep. and

Adesida Dep. Ex.); Deposition of Barbara Wilson (B. Wilson Dep. and B. Wilson Dep.

Ex.); Deposition of Chris Wilson (C. Wilson Dep. and C Wilson Dep. Ex.); Deposition

of Laura Clower (Clower Dep. and Clower Dep. Ex.); Deposition of Robert Easter

(Easter Dep. and Esater Dep. Ex.); Deposition of Matthew Finkin (Finin Dep. and

Finkin Dep. Ex.); Deposition of Michael Hogan (Hogan Dep. and Hogan Dep. Ex.);

Deposition of Eric Johnson (Johnson Dep and Johnson Dep. Ex.); Deposition of

Christopher Kennedy (Kennedy ep. And Kennedy Dep. Ex.); Deposition of Phyllis

Wise (Wise Dep. and Wise Dep. Ex.); Deposition of Louis Wozniak (Wozniak Dep.

and Wozniak Dep. Ex.)I.  Plaintiff also adds the following two exhibits: Affidavit of

Louis Wozniak (Pl. Ex. 1); and FOIA 17-249(Pl. Ex. 2 and Pl. Ex 2A) and FOIA

Request 18-118- Pl. Ex3)

I.       **Defendants' Summary Judgment Motion Must Be Denied Because Plaintiff Has Demonstrated Sufficient Facts to Allege a Cause of Action Under the First Amendment.**

         **a.  Facts.**

         Defendant Clower communicated that the election process was not a University

function, but an autonomous activity of the honor societies and that, in reaction to that, the

Plaintiff exercised his right as a citizen and filed a lawsuit in the Circuit Court of Champaign

County, Illinois, against the presidents of the autonomous honor societies.  Presumably, the

University's senior attorney and chief prosecutor against Plaintiff in the proceedings before

Committee on Academic Freedom and Tenure ("CAFT") would know whether the activities of

---

I Plaintiff's exhibits marked Name, pp. are the depositions of the named party or person(e.g. Finkin dep. p. 41 refers to page 41 of Matthew Finkins deposition; Plaintiff's exhibits marked Name, Ex. (e.g. Finkin Ex 1 refers to Exhibit 1 of the Matthew Finkin Deposiiton).  All the exhibits included in Defendants' Motion submission for the named party or person are incorporated by Plaintiff's Response except Ms. Clower's affidavit..

the honor societies were or were not University processes.  Defendant Laura Clower, as senior attorney for the University, has admitted the award selection process was a public matter and not merely a University personnel matter.  The CAFT, which conducted an actual evidentiary hearing, also clearly recognized that Plaintiff's filing of a lawsuit was in furtherance of Plaintiff's First Amendment rights.

The facts that the Defendants feel are pertinent omit the allegation that the Plaintiff discussed and published wrongdoing by employees of the University of Illinois who influenced the results of an election causing a change to the election's outcome, because recognizing such facts would establishes that such matters are or at the very least plausibly of public concern.

The Committee on Academic Freedom of Tenure (CAFT)) Report provides that essentially the hearing committee exonerated the Plaintiff of all charges with a notable exception concerning a directive that was a patent attempt at a prior restraint on speech.  In spite of positive report exonerating Plaintiff, Defendant Easter proceeded to move the matter to the Board of Trustees of the University of Illinois in furtherance of Plaintiff's discharge from employment and revocation of tenure.  Certainly, the motivation of Defendant Easter or those advising them, such as Defendant Clower, was plausibly to punish the Plaintiff for exposing wrongdoing of departmental employees under the Department Head and College Dean (who later was selected Provost until his fall from Grace relating to dirty dealings in another high profile First Amendment case involving the University.

Plaintiff exercised his First Amendment rights to publish information concerning the misconduct and irregularities in the College of Engineering relating to the student election on Plaintiff's website known as www.Illethics.com.Various Defendants prosecuted a case for revocation of Plaintiff's tenure and termination of employment on the basis of 1) the allegations initially brought and heard by the CAFT for which Plaintiff was essentially

exonerated; and 2) new allegations that the Plaintiff exercised his rights to free speech in making certain documents and information concerning not only the original misconduct within the College of Engineering relating to the influencing of the outcome of the student election but further misconduct of the University officials in violating the University statute concerning the procedures and protocols in furthering the termination proceedings against the Plaintiff at the Board of Trustees level.  Prominent through Defendant Clower's arguments in furtherance of Defendants' attempts to fire Plaintiff was the argument that Plaintiff's conduct was unacceptable due to "blast" emails to a wide variety of recipients in what they perceived as an attempt to "externalize" what should be an "internal" procedural matter.

### d.    Plaintiff's First Amendment Complaint Is Based Upon Protected Speech That Involves a Public Concern.

To be protected, employee speech must relate to a matter of "political, social, or other concern to the community." Miller v. Jones, 444 F.3d 929, 934-935 (7th Cir.2006) quoting Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).  In enunciating the "matter of public concern," the Seventh Circuit has stated that when the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of public concern, they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy.193

To determine whether a personal grievance nonetheless raises to the level of public concern, "it is necessary to 'look at the point of the speech in question: "was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?'" Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th Cir.1999) (quoting Callaway v. Hafeman, 832 F.2d 414, 417

(7th Cir.1987)).  To determine if speech raises issues of public concern, the courts look to the "content, form and context" of the speech in question.  <u>Chaklos v. Stevens</u>, 560 F.3d 705, 712 (7th Cir. 2009).  The Seventh Circuit has held that "content" is the most important factor in analyzing whether speech raises a public concern.  <u>Chaklos v. Stevens</u>, 560 F.3d 705, 713-14 (7th Cir. 2009) ("Defendants also argue that plaintiffs' self-serving motives outweigh the public importance of the speech. As an initial matter, we note that content remains the most important factor in determining whether speech addresses a matter of public concern.').  An individual's personal motives are not dispositive of whether speech addresses a public concern.  <u>See Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.</u>, 42 F.3d 403, 410 (7th Cir.1994) (cautioning against using a speaker's motive as "an absolute litmus test [to] supplant content in terms of overall importance to the public concern inquiry.").  In evaluating these factors, courts look at whether the government employee sought to "bring to light actual or potential wrongdoing or breach of public trust." <u>Miller</u>, at 934–35, quoting <u>Connick</u>, 461 U.S. at 148, 103 S.Ct. 1684.

Through their Motion, Defendants continue to attempt to mischaracterize the Plaintiff's efforts to expose misconduct in a student election and ensuing cover-ups by University employees and administrators as a "personal grievance" focused solely on winning a teaching award that he had previously won that provided a mere $500.00 prize.

Wozniak's speech was not about his being denied a teaching award, it was about his broadcasting to students, faculty, alumni, donors and the world at large via email and the internet that the University had improperly schemed to circumvent a student election of an honor society award.  Wozniak testified that the University had promoted and publicized about the award through an annual awards banquet and mailings to faculty, students and

alumni and used the award and publicity as a means to raise substantial money from donors and raise the profile of the engineering department.

Even if Plaintiff's sole purpose was to communicate to the public that he unjustly had been denied a teaching award and, therefore, his exposure of that fact was of a public concern because such denial impacted the previously recognized public concern "educational improvement and fiscal responsibility in public schools clearly are matters of public concern" that has been recognized under Central District precedent. Sun v. Board of Trustees of University of IL, 429 F.Supp.2d 1002, 1027-1028 (2006). In Sun, Plaintiff argued that his denial of a teaching award impacted a public concern because "the award winner was announced in the College of Engineering and in other public forums" and that information "was not only important to the recipient but also "to the current and future students of the Department, their parents, and alumni who were concerned about the quality of teaching in a public institution." Sun at 1028. Defendants had argued that the award was merely a private concern only of interest to plaintiff. Id. The district court agreed finding that the publication of the award weighed in favor of finding that the plaintiff's speech about being denied the award rose to a public concern. Id. ("This court concludes that the issue of whether Plaintiff's speech constituted speech on a matter of public concern is a close one. However, this court concludes that Plaintiff has persuasively argued that the Teacher of the Year award was publicized and was of interest to the public. This court therefore concludes that Plaintiff's speech related to a "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."). In the instant matter, the teaching award in question also was publicized to students, faculty and others and, therefore, the same public concern that arose in Sun would be applicable here.

In fact, Wozniak's speech was not merely limited to Defendant's improperly denying him a teaching award that he had legitimately won.[1]  Rather, Plaintiff created a website titled www.Illethics.com to spread the word regarding Defendants' unethical handling of his legitimate complaints about their improper intervention in a student election and supplemented his postings to the website and in other communications to expose Defendants' ensuing illegal efforts to punish him and silence him for exposing their improper conduct. Plaintiff's efforts to expose misconduct received substantial press including front page headlines in local and regional newspapers as well as radio stations and the AAUP. Defendant seek to narrow the court's focus on Plaintiff's complaints about not winning an award, but the heart of the allegations of the Complaint focus on Plaintiff's speech regarding Defendants' unethical actions in distorting the selection process and their ensuing efforts to cover their tracks and punish him for exposing their misdeeds.

Defendants rely on Bivens v. Trent, 591 F.3d 555 (7th Cir. 2010) in an attempt to demonstrate how the "content, form and context of Plaintiff's speech should be deemed to be private for the sake of determining whether or not his speech raised a public concern.  The Bivens court found that the form and context of Biven's speech was completely private in nature and, thus, the fact that his speech touched upon a potentially public subject, public health, did not raise a public concern. Bivens at 562.  Bivens, however, is easily distinguished from the instant claim.  In Bivens, plaintiff was a state police officer who raised an internal

---

[1] Even is some aspect of Plaintiff's speech was deemed to be private (e.g. his complaints about not receiving a teaching award) that would not render the entirety of his speech private. See Miller v. Jones, 444 F.3d 929, 937 (7th Cir. 2006) ("Finally, we consider the context of the speech at issue, evaluating Miller's motive and circumstances. While a statement born of pure personal interest does not constitute a public concern, a mere personal aspect of the speaker's motivation will not defeat the entire speech.") See also Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th Cir.1999).  In fact, Wozniak testified that his motivation was not about his losing the award but about the students' votes not being recognized and their right to choose the award winner being usurped.

grievance with his employer regarding his health being impacted from having been assigned to a firing range that was subject to lead contamination.  Id. at 560-561.  In finding that Biven's grievance failed to raise a public concern, the court emphasized that the "form" of his union grievance had been raised and heard in a private grievance proceeding that was entirely internal to the Illinois State Police Department.  Id. at 561.   Moreover, the "context" of Biven's speech in the private grievance proceeding had focused entirely on his own health problems as a full-time worker at the firing range and not upon any public issues.  Id.  Finally, the "content" of Bivens' speech had not even mentioned how his private health grievance impacted public health concerns even though the firing range was open to the public.  Id. at 561-562.

In the instant case, Plaintiff's form of expression has been anything but private.  Rather, Plaintiff has expressed his concerns about Defendants' unethical conduct and illegal actions to a broad array of public recipients outside of the framework of the grievance process within the University of Illinois through a wide variety of mostly public communication vehicles including his website, emails, Youtube postings, personal communications, the filing of a civil lawsuit, and the University's internal grievances process.  Defendants' allegations of misconduct in their Article X charges against Plaintiff acknowledged the very public means employed by Plaintiff to communicate with a wide range of recipients including students, former students and those outside the University.  Defendants' displeasure with the public nature of Plaintiff's communications can be seen in their Article X charges that claimed that the airing of such "dirty laundry" "outside" of the University process was unprofessional and rendered the Plaintiff unfit to continue tenured employment with the University.  The fact that local and regional news agencies have published front page articles about Plaintiff's concerns about Defendants' unethical and illegal conduct also provides further evidence that

his complaints about unethical conduct was important to the public. <u>Gustafson v. Jones</u>, 290 F.3d 895, 908 (7th Cir. 2002) ("Although evidence of actual public interest is not dispositive of whether speech is on a matter of public concern, the fact that the press and elected officials took such a keen interest in Jones's orders is certainly relevant to the issue.")

Similarly, the context of Plaintiff's speech has not been to narrowly focus on personal issues, like Bivens' health problems, but, rather has been to expose unethical behavior on behalf of public officials. Although Defendants' Motion focuses narrowly on Plaintiff not receiving a teaching award, as the internal grievance processes evolved into proceedings to obstruct justice rather than disclose facts, Plaintiff's public speech continued and expanded to include allegations in his public postings of alleged "cover ups" and improprieties by Defendants. Plaintiff arguably was terminate because senior level University officials were upset Plaintiff kept publicly embarrassing them.

Finally, and most importantly, the content of Plaintiff's speech addressed public concern. The allegations in the Plaintiff's Complaint set forth much more than the mere expression that the Plaintiff did not win a teaching award. The Plaintiff specifically alleges that University employees influenced the honor society presidents to change the result of an election, then covered up their misdeeds by obstructing Plaintiff's access to information and finally instituted termination proceedings because of his attempts to expose their unethical behavior. Exposure of unethical and illegal behavior by high level officials of a public university is most certainly of a public concern to the students, faculty, alumni and citizens of the state of Illinois.

1.    **Wozniak's speech was a substantial and motivating factor in the alleged retaliatory action.**

To succeed on his retaliation claim, Wozniak must establish that his speech was a substantial or motivating factor in the alleged retaliatory action. *Hutchins v.*

*Clarke*, 661 F.3d at 955. "To establish a causal link between the protected expression and a subsequent action by the employer, the plaintiff must show that the protected conduct was a substantial or motivating factor in the employer's decision." Massey v. Johnson, 457 F.3d 711, 717 (7th Cir. 2006), citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather factor that motivated the defendant's actions." Massey v. Johnson, 457 F.3d at 717. If a plaintiff makes this threshold showing, the burden then shifts to the defendants to produce evidence that they would have fired the plaintiff even in absence of the speech. *Id.* "In other words, the defendants may show that retaliation was *not* the but-for cause for the firing." *Id.* (emphasis in original).

Here, Wozniak has presented evidence that the University began the termination process with Defendant Adesida's March 30, 2010 letter in which he warned Wozniak not to further involve students about his concerns related to the teaching award.  The University specifically cited Wozniak's May 12, 2010 emails to students attaching a Youtube  link featuring him offering his thoughts about the teaching award he didn't receive in its Allegations in support of its Statement of Charges before the CAFT and the BOT.  Wozniak's action to continue to communicate with students (and others) about the teaching award scheme not only formed the basis for his initial teaching reassignment, it was submitted by the University to both the CAFT and the BOT as "allegations" in support of the charges to revoke Wozniak's tenure.  The University later added additional charges against Wozniak that it presented to the BOT through its index of exemplars replete with examples of Wozniak communicating about the teaching award scheme.

   2.   **Wozniak's Speech About Wrongdoing and Breach the Public Trust is Not Outweighed By the University's Unsubstantiated Showing That His Speech Was Potentially Disruptive**

In the Seventh Circuit Court of Appeals, public employee speech is protected by the First Amendment if: (i) it will be protected if uttered by a private citizen; (ii) it involves more than a personal employee grievance; and (iii) the employer does not show a convincing reason to prohibit the speech. 190 Once the employee establishes that the speech is on a matter of public concern, he "place[s]his speech, prima facie, within the protection of the First Amendment."  The weighing of interests as detailed by the Supreme Court in Pickering v. Bd. Of Educ. Twp. High Sch. Dist., 391 U.S. 563 (1968).

The Seventh Circuit's requires that "[w]hen an employee speaks out about actual wrongdoing or breach of public trust the government must make a more substantial showing that the speech is, in fact, likely to be disruptive." (underline added) 202  Defendants through their Motion would seek to dismiss Plaintiff's First Amendment claim based upon likely no actual disruption.

Wozniak's speech is fundamentally about actual wronging on behalf of University officials who breached the public trust by circumventing the student vote in a teaching award election.  In response, Defendants argue that the University's interest in protecting its students from "potential" disruption made it necessary for it to terminate Wozniak notwithstanding the substantial public concerns he has raised.

But a closer look at the facts demonstrate that Defendants have not made a substantial showing regarding any real disruption Wozniak's speech caused.  There is no evidence in the record to suggest that Wozniak's speech caused any actual disruption.  Defendants Clower and Wilson took it upon themselves to review Wozniak's website for alleged FERPA violations and personally identifiable information that they claim was violative of University policies immediately after receiving a less than satisfactory report from the Finkin CAFT.  They were not acting on the complaints of students.  President A of the honor society never initiated a

complaint against Wozniak about his broadcast of his teaching award investigation and their meeting.

Even under Pickering, Defendants' reliance on the University's educational mission many of which were determined to be unfounded by the CAFT committee chaired by Defendant Finkin who took evidence on these claims. The fact that Defendants rejected CAFT's findings should give the court pause to give them sufficient weight to counter the public concerns raised by Plaintiff's free expression. The CAFT looked closely and found "no charge of defamation, invasion of privacy, intentional infliction of emotional distress or other wrongful conduct in the content of these messages."

Defendants' heavy reliance on Wozniak's publication about President A's emotional state which is identified throughout both the CAFT and BOT statement of charges and submission to both the CAFT and BOT as "confidential" information that must be protected from publication also requires more than the court to merely accept that the University truly was acting to protect President A when it dismissed Wozniak.

In 2017, Wozniak made a FOIA request to the University to obtain a copy of the CAFT report. Pursuant to FOIA rules, the University may redact information produced via FOIA requests to preserve the privacy of individuals and to protect information that is otherwise protected under FERPA. Notwithstanding, these exemptions, which the University has employed continuously to redact its production of documents in response to Plaintiff's many other FOIA productions, its FOIA production of the CAFT report included the very same references to President A's identity ("President of Gamma Epsilon" p. 24), her educational record ("valedictorian" of her high school class p. 12, 24) and her emotional state ("broke into tears and cried several times" p. 14) which was at the heart of the University's statement of charges against Wozniak and the basis for his termination.

47

**e.     Plaintiff's Allegations Assert a Cause of Action For a Claim of "Prior Restraint."**

As provided in Defendants' Motion, the term "prior restraint" describes administrative and judicial orders forbidding certain communications when issued in advance of the time such communications are to occur.  Samuelson v. Laporte Cnty. Sch. Corp., 526 F.3d 1046, 1051 (7th Cir. 2008).  A finding of "prior restraint" requires the following elements:  (1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communications; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves 'appraisal of facts, the exercise of judgment, and the formation of an opinion by the decision maker."  Samuelson, 526 F.3d at 1051.

Defendants' Motion summarily dismisses Plaintiff's prior restraint claims based upon their claim that Plaintiff's speech did not rise to a public concern.  For the previously stated reasons, Plaintiff's speech raised issues of public concern.  Moreover, Defendants engaged in prior restraint against his public speech by directing Plaintiff as to which content he was allowed to publish on his website and then terminating him by allegedly not complying with their directives.

The CAFT report authored by Defendant Finkin specifically stated that:

"Second and categorically, any reference that directly or indirectly discloses his conversation with Ms. Walker should be deleted and no future reference be made to it by Prof. Wozniak in any website, email, or the like means of public or quasi-public communication."

***

"Prof. Wozniak's failure or refusal to comply with either of the two latter conditions shall be cause to dismiss him."  (Complaint, #1-1, p. 63).

Pursuant to CAFT's administrative decision, Wozniak was specifically instructed that he could not disclose conversations that would bear upon a reader's determination as to the credibility of the assertions or he would be fired.  Although Defendants rely upon the distorted idea that the CAFT could only make "recommendations" not directives, their own actions belie this assertion.  After the CAFT report was issued, Defendants Wilson, Easter, Adesida and Clower all directed that communications and data be removed from Plaintiff's website.  Defendants Wilson, Wise, Clower and Easter all played a role in ensuring Wozniak's postings to his website after the Defendant Easter's referral letter had been issued on February 8, 2013 were presented as additional information before the BOT to seek Wozniak's dismissal.  Ultimately, charges brought by Defendant Easter to the BOT included allegations that the Plaintiff violated Finkin's admonition and that formed an adequate basis for his discharge.  Defendant Clower's List of Exemplars presented to the BOT begins with thirteen examples under a heading "Violations of the CAFT Directive."  Moreover, the major thrust of Defendant Johnson's presentation to the Board of Trustees was that Plaintiff's alleged violation of the "gag order" [prior restraint] formed an adequate basis for the Board of Trustees to bring new charges and to terminate the Plaintiff without further due process proceedings as required under Article X of the University Statutes.  For the foregoing reasons, Plaintiff has adequately pled "prior restraint" by Defendants and Defendants' Motion should be denied.

### f.   Defendants Are Not Entitled to Qualified Immunity.

In those circumstances in which qualified immunity is assessed pre-trial, courts follow the "Supreme Court's admonition that in determining the immunity issue prior to trial, the facts must be "taken in the light most favorable to the party asserting the injury." Doe v. Board of Trustees of University of Illinois, 429 F.Supp.2d 930, 944 (2006) (citing Saucier v.

<u>Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  Once the public official

raises the defense of qualified immunity, the plaintiff bears the burden of showing (1)

whether he or she has asserted a violation of a constitutional right, and (2) whether the

applicable constitutional standards were clearly established at the time in question.  <u>Khuans</u>

<u>v. School Dist. 110</u>, 123 F.3d 1010, 1013 (7th Cir.1997).

     Defendants' Motion claims that if Plaintiff's speech was constitutionally protected and

that Plaintiff's constitutional right was not clearly made out at the time of the alleged

violation but Plaintiff's right to expose ethics violations and not be subject to retaliation may

be reasonably inferred.  Defendant Finkin communicated with Defendants Adesida, Hogan

and Easter that Wozniak's freedom of expression was at issue as a result of Adesida's broad

proscription against Wozniak communicating this very point to them in 2010 after Wozniak

began to voice his complaints about the University's improper involvement in the teaching

award process  This issue was again made clear during the CAFT hearing and addressed by

Defendants Finkin, Clower at Adesida at that time.  Wozniak's counsel objected to Defendant

Finkin's recommendations in the CAFT report because they impaired Wozniak's freedom of

expression. The CAFT specifically concluded that the Plaintiff had a constitutional right as

any other citizen to pursue a state law civil suit.  Defendant Wise also read the CAFT report

and was aware that her recommendation to present additional information to the BOT was

base on Defendant Wilson's February 2013 letters.  Defendant Johnson also was aware of the

freedom of expression issue during his term as CAFT chair but chose to recommend dismissal

primarily due to Wozniak's failure to abide by the CAFT's gag order.  Defendant Kennedy and

the BOT were aware of Wozniak's free speech complaint and addressed it in the BOT's Report

but dismissed Wozniak anyway.

In sum, Defendants were well aware that Plaintiff's discharge for his continuing to articulate facts germane to the alleged departmental misdeeds would be a First Amendment violation. For the foregoing reasons, Defendants' Motion for Summary Judgment Count I under qualified immunity grounds should be denied.

II.     **Defendants' Motion for Summary Judgment to Dismiss Count II of Plaintiff's Complaint Must Be Denied.**
        a.      **Facts.**

Plaintiff has alleged that he was a tenured Associate Professor at the University of Illinois and as such was entitled to due process protections under Article X of the University Statues in any proceeding seeking to revoke his tenure and terminate his employment.  Notwithstanding the requirements of the University Statutes, Defendants Easter, Hogan and Adesida initially took action to reassign Wozniak from teaching without hearing in 2010 notwithstanding precedent and binding Statutory authority that established that a hearing was required for such discipline.  After Wozniak filed a grievance that was found meritorious by CAFT, Defendants Adesida, Hogan and Easter instituted sham proceedings outside of the required Article X proceedings required to remove a tenured professor as their initial means for terminating Plaintiff for exercise of his free expression before a College Grievance Committee.  Defendant Finkin described this proceeding as a "show cause" proceeding stripped bare of the protections of due process.  Defendant Clower guided Defendants Easter, Hogan and Wise throughout this process regarding multiple deprivations of due process rights through her legal counsel.

Defendants used those sham findings to support their termination of Wozniak notwithstanding the fact that Plaintiff had not participated in those proceedings based on the advice of law professor and then CAFT chairperson Defendant Finkin.

After Defendants were warned that the irregular proceedings violated Plaintiff's due process rights by Defendant Finkin, Defendants provided Plaintiff with an Article X proceeding that exonerated him of eleven of the twelve charges raised against him (including several raised in Defendants' Motion as alleged basis for making a Pickering weighing against Plaintiff). Defendants Clower and Wilson met numerous times at staff meetings regarding the Wozniak situation. During the CAFT proceeding, Defendant Finkin repeatedly warned Defendant Clower regarding her unprofessional behavior due to her failure to bring specific charges against Wozniak. Defendant Finkin described the charges brought by Defendant Clower as "atmospheric" and "generally a bad person, a bad egg, as grounds of dismissal.

Notwithstanding CAFT's findings that Plaintiff had not committed violations sufficient to remove his tenure, on February 8, 2013, Defendant Easter proceeded to refer termination proceedings before the BOT against Wozniak on all charges reviewed by CAFT. In February 2013, Chris Wilson was engaged to represent "the Board of Trustees". One of Mr. Wilson's first acts was to assist Defendant Easter in drafting the statutorily required referral of charges to the BOT. Neither Wozniak nor his counsel were aware in 2013 that Mr. Wilson purportedly represented not just the BOT but also all the remaining Defendants including the President's office that was bringing the termination charges against Wozniak before the BOT.

That same month, Defendant Wilson and Defendant Clower proceeded to review Wozniak's website on their own volition in which he raised his complaints regarding the teaching award scheme and communicate to him by letter that his postings were violative of unspecified University policies and FERPA. Defendant Wilson reported to Defendant Adesida at that time. When Wozniak responded that the student information on his website

contained information similar in nature to the information available of the University's Student Directory, and requested assistance From Defendant Wilsonnto identify the allegedly violative postings, Defendant Wilson responded again with a few additional details but again failed to identify the University policies at issue other than to generally claim violations of FERPA and University Policy.  Defendant Clower herself had made the determination that the postings violated FERPA.  On February 27, 2013, Defendant Wilson sent a letter to Defendant Wise recommending that the issues identified by her and Defendant Clower be considered to be part of the pending BOT proceeding. Defendant Wise soon thereafter made a similar recommendation to Defendant Easter .  At the time of the recommendation, Defendant Wise had no independent knowledge whether Wozniak's postings violated FERPA. Upon receiving Defendant Wise's recommendation, Defendant Easter requested feedback from Defendant Clower, the individual who had initiated the review of Wozniak's website as to whether the new charges should be referred to the CAFT.  Soon thereafter, Defendant Easter unsurpisingly agreed that these additional charges could be brought directly before the BOT without first being adjudicated by the CAFT as required in the Statutes.  Defendant Easter then directed Defendant to consult with the FAC to get a consensus on that position. Defendant Wise who had no independent knowledge whether Wozniak's website was violative of FERPA did just that.  Wozniak's counsel was not informed that these additional charges were going to be presented to the CAFT until June 2013.

In February 2013, Wozniak's counsel wrote Chris Wilson to gain information regarding the nature of the proceedings to be conducted before the BOT and to suggest that AAUP principals should be followed.  Mr. Wilson did not respond to these requests or to counsel's subsequent requests in March and April 2013.  Instead, throughout March and April 2013, Chris Wilson met and communicated with Defendants Clower and Veazie multiple times to

discuss next steps and whether the Wozniak postings would be presented to the BOT in the

pending Article X proceeding.  Wozniak was unaware of these communications.  By April 30,

2013, the BOT proceeding had been scheduled as a four hour proceeding for September 23,

2013.  Notwithstanding these facts, on May 7, 2013, Chris Wilson informed Wozniak's counsel

that the proceeding had not been scheduled and that no decision had been made regarding

the nature of the proceedings.  Wozniak's counsel also did not learn that the University would

be presenting information regarding Wozniak's postings on his website in June 2013.

Wozniak's counsel did not learn about the proposed nature of the proceedings until July 2013.

At that time, Chris Wilson told Wozniak's counsel that the BOT would decide whether to

consider the new information or send it back to a CAFT.  This was three months after Mr.

Wilson's consultations and meetings with Veazie about this same topic.  Wozniak's counsel

later objected to the process and the University's submission of new information outside of

the CAFT but his objections were denied.  Defendant Kennedy did not recall these motions

and the BOT did not refer these new charges bac to the CAFT.

On August 22, 2013, eight days after Defendant Clower's President's pre-trial

brief was issued, Chris Wilson brokered a meeting and negotiation between Defendant Easter

and Defendant Johnson to change the language of the President's brief to satisfy the CAFT

that had been offended by the language in the original submission.  Defendant Johnson had

threatened to modify his presentation before the BOT if the President's original brief was not

withdrawn.  Wozniak's counsel did not participate and was not aware of these negotiations.

Defendant Johnson's CAFT subsequently submitted its presentation that stated that the

CAFT did not have to perform its statutory function as fact finder with regard to the new

charges and recommended dismissal if the BOT found that Wozniak had violated the CAFT's

directive.  This occurred one month after Defendant Johnson communicated to his CAFT that

there was no feasible way for the BOT to rehear charges presented to the previous CAFT in a four hour proceeding.

On September 23, 2013, the BOT held a four proceeding in Defendant Clower presented the case for the University using the statement of charges that had been rejected by the CAFT as not specific.  In so doing, she presented before the BOT numerous claims that had either been rejected or denied by the CAFT including allegations that reached back to incidents involving Wozniak more than twenty years for which he had been exonerated by CAFT.  In addition, Defendant Clower presented 65 additional charges related her and Defendant Wilson's own review of Wozniak's website.  These charges alleged various FERPA claims as well examples of other alleged violations of University policies.  Defendant Clower provided Wozniak with a packet of authorities but it did not specify which pliy eah of the 65 new charges supposedly violated.  Wozniak was given forty minutes to present his case in chief and a limited time to cross-examine Defendant Wilson.  Wozniak could not cross-examine Defendant Johnson.

After the proceeding, the BOT met in executive session but according to Defendant Kennedy did not render a decision.  Defendant Kennedy testified that the BOT rendered its decision at its next scheduled meeting on November 14, 2013.  Circumstantial evidence makes very clear that Chris Wilson authored the BOT Report and did so in advance of the November 14, 2013 BOT meeting.

> **d.** **Count II of Plaintiff's Complaint Sets Forth Sufficient Allegations To State a Cause of Action Against Defendants Adesida, Hogan, Easter, Clower, Wilson, Wise, Finkin, and Johnson.**

The Seventh Circuit has held that "[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." Wolf–Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir.1983). Stating further, "[a]n official satisfies the

personal responsibility requirement ... if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." <u>Smith v. Rowe</u>, 761 F.2d 360, 369 (7th Cir.1985)  To be held liable, the individual defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." <u>Gentry v. Duckworth</u>, 65 F.3d 555, 561 (7th Cir.1995).

As set forth above, Wozniak alleges sufficient facts to bring due process claims against all individual defendants because he adequately demonstrates that each knew about the University's due process violations, facilitated them, approved them, condoned them, or ignored them in order to wrongfully deprive Plaintiff of his constitutionally protected property interest.  Plaintiff's Statement of Facts is replete with specific claims demonstrating exactly that against all named individual Defendants.

The following merely highlights a few of the numerous illegal actions taken by the individual Defendants in violation of Plaintiff's due process rights under the Fourteenth Amendment.

  (i)    **Defendant Adesida.**  Defendant Adesida, in the face of the governing University of Illinois Statutes and Articles IX and X therein, removed the Plaintiff from all teaching duties prior to the initiation of any proceedings under either Article IX or Article X of the University Statutes.  He then, against the strong admonitions of the Chairman of the CAFT, Defendant Finkin, established a show hearing tribunal whose decision served as the basis for Defendant Hogan's initiation of Article X proceedings.

  (ii)   **Defendant Clower.**  Defendant Clower relied heavily upon the ex parte and illegally constituted Dean's committee in prosecution of the Plaintiff's Article X administrative hearings and ultimate prosecution of Plaintiff's discharge before the Board of Trustees itself after the CAFT essentially exonerated the Plaintiff in the Article X proceedings.  Defendant Clower brought numerous charges that lacked specificity that were deemed deficient by the CAFT before the BOT.  She also brought new charges against Plaintiff without notice before the BOT including charges that had not been previously vetted by the CAFT panel in violation of Plaintiff's due process rights and inconsistent with her obligations to Plaintiff under

Article X of the University Statutes.  Notwithstanding University Statute that required Defendant Easter to refer all charges to the Board of Trustees within 30 days of the CAFT panel's findings, Defendant Easter submitted these findings, and numerous additional charges, more than 6 months later, and less than 2 weeks before Plaintiff's sham hearing before the Board of Trustees highly impairing Plaintiff's ability to defend himself.

(iii)   **Defendant Wise.**  Defendant Wise improperly instituted an ex parte and illegally constituted Dean's committee in prosecution of the Plaintiff's Article X administrative hearings and ultimate prosecution of Plaintiff's discharge before the BOT and recommended that new charges be brought against Wozniak without a CAFT hearing in violation of University statutes.

(iv)   **Defendant Easter.**  Defendant Easter improperly instituted an ex parte and illegally constituted Dean's committee in prosecution of the Plaintiff's Article X administrative hearings and ultimate prosecution of Plaintiff's discharge before the Board of Trustees.  Defendant Easter also referred all charges, including numerous charges against Plaintiff that had not been subject to a CAFT hearing and had not been noticed to Plaintiff, to the BOT as grounds for revoking Plaintiff's tenure and terminating his employment.  Notwithstanding University Statute that required Defendant Easter to refer all charges to the Board of Trustees within 30 days of the CAFT panel's findings, Defendant Easter submitted these findings, and numerous additional charges, more than 6 months later, and less than 2 weeks before Plaintiff's sham hearing before the Board of Trustees highly impairing Plaintiff's ability to defend himself.

**(v)**   **Defendant Hogan.**  Defendant Hogan, in spite of admonitions that the Plaintiff could not be tried before a Dean's tribunal and could not be removed from all University functions without a statutory proceeding under Article IX or Article X of the University statutes, coordinated with the other Defendants and particularly Defendant Clower in dragging matters out until the Defendants developed the ostensible basis for initiation of the proceedings that culminated in the Plaintiff's discharge; i.e. the Dean's advisory committee ex parte findings.

**(vi)**   **Defendant Johnson.**  Defendant Johnson improperly allowed Defendant Clower to supplement charges against Plaintiff without providing him his due process rights under Article X.  Defendant Johnson did so secretly negotiating with Defendant Easter regarding the President's trial brief Defendant Johnson also testified before the BOT regarding the validity of supplementing the numerous additional charges against Plaintiff

notwithstanding his being denied the necessary CAFT hearing on these new charges.  Defendant Johnson urged the BOT to terminate Plaintiff for his actions related to exposing improprieties by departmental employees in rigging a student election and retaliated against Plaintiff when he posted additional materials exposing Defendants' attempts to cover up their unethical and illegal behavior.

(vii)   **Defendant Wilson.**  Defendant Wilson urged the BOT to terminate Plaintiff for his actions related to exposing improprieties by departmental employees in rigging a student election and retaliated against Plaintiff when he posted additional materials exposing Defendants' attempts to cover up their unethical and illegal behavior.  Defendant Wilson also presented evidence before the Board of Trustees that Plaintiff should be terminated for exposing illegal and unethical activities by University employees.

e.   **Defendants Violated Plaintiff's Fourteenth Amendment Rights.**

Defendants' Motion argues that Plaintiff was afforded due process notwithstanding Defendants having failed to provide Plaintiff with the due process protections he is afforded under Defendants' University Statutes.  Although Defendants are correct in asserting that due process does not require that all University procedures be followed, Defendants' failures here fall so far below those requirements that Plaintiff has adequately plead that he was provided "sham process" and not due process.  Defendants' Motion speaks to the idea of notice, opportunity to defend and hearing but in reality as Plaintiff's can demonstrate, Plaintiff was not afforded a due process to defend himself against the charges brought against him.  Levenstein v. Salafsky, 164 F.3d 345, 351 (7th Cir. 1998) ("Levenstein had notice of the charges and understood the evidence against him, but when the procedures used to investigate the charges are a sham through and through, there has not been a constitutionally sufficient opportunity to respond."); See Doe v. Board of Educ. of Oak Park & River Forest High School Dist. 200, 115 F.3d 1273, 1283 (7th Cir.1997); Ciechon v. City of Chicago, 686 F.2d 511, 517 (7th Cir.1982) ("Due process requires that a hearing 'must be a

real one, not a sham or a pretense.' ") (quoting <u>Joint Anti–Fascist Refugee Committee v.</u>

<u>McGrath</u>, 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring),

quoting <u>Palko v. Connecticut</u>, 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). "No

matter how complete the panoply of procedural devices which protect a particular liberty or

property interest," the Seventh Circuit holds, "due process also requires that those procedures

be neutrally applied." Ciechon v. City of Chicago, 686 F.2d 511, 517 (7th Cir.1982).

    <u>Inland Steel Co. v. N.L.R.B.</u>, 109 F.2d 9 (7th Cir. 1940) ("'Due process implies a

tribunal both impartial and mentally competent to afford a hearing." "A judge must

necessarily be free from all bias and partiality. He cannot be both judge and party, arbiter

and advocate in the same cause. Mankind are so agreed in this principle that any departure

from it shocks their common sense and sentiment of justice.' And the fact that the court's

judgment may be justified on the merits does not obviate the requirement of a fair trial.") In

an administrative context, an agency complaint that reasonably informs a person of the

controversial issues involved satisfies due process unless that person can demonstrate that he

or she was misled. L.G. Balfour Co. v. FTC, 442 F.2d 1, 19 (7th Cir.1971)

    In the instant case, Wozniak can demonstrate that he as misled by Chris Wilson, the

advisor to the BOT.  Chris Wilson's unrevealed role as advisor to the BOT while working

hand in hand with the President's office is particularly troubling.  It is arguable on the facts,

that Mr. Wilson and the President's worked together to set procedures for the BOT

proceeding without Wozniak counsel's knowledge or input and then rejected Wozniak's

objections on these points without revealing that Mr. Wilson had already determined these

issues jointly with the President's office.  Mr. Wilson withheld information from Wozniak and

his counsel regarding the nature of the proceedings the information that was to be considered

by the BOT and even the dates of the proceeding until months after he had discussed these

issues with the University and the University knew how the proceeding would unfold disadvantaging Wozniak.  Mr. Wilson also played a role in negotiating with Defendant Johnson and the President's office regarding their respective submissions before the BOT all without Wozniak or his counsel's knowledge.  Finally, it is believed that Mr. Wilson drafted the BOT Report in advance of the BOT rendering its opinion again calling into question whether Wozniak received a sham hearing before the BOT.  As Mr. Wilson was the direct advisor to the BOT, and attended all BOT meetings, these actions call into question the fundamental fairness of the BOT proceeding.

In sum, Wozniak was a tenured Associate Professor at the University of Illinois and as such was entitled to due process protections under Article X of the University Statues in any proceeding seeking to revoke his tenure and terminate his employment.  Notwithstanding the requirements of the University Statutes, Defendants instituted sham proceedings outside of the required Article X proceedings required to remove a tenured professor as their initial means for terminating Plaintiff for exercise of his free expression and used those sham findings to support their termination of Plaintiff notwithstanding the fact that Plaintiff had not participated in those proceedings based on the advice of law professor and then CAFT chairperson Defendant Finkin.

Instead of providing Plaintiff with due process, Defendants; "sham process" began from with its very first act when it attempted to institute revocation proceedings against Plaintiff devised by Defendants Clower, Adesida and Wise that not only did not adhere to Article X guidelines but also (by the analysis of CAFT chairman Defendant Finkin) did not even afford Plaintiff minimal due process.  Nothwithstanding these proceedings serious shortcomings, Defendants used the results of these proceedings as grounds to terminate Plaintiff.  These same Defendants and Defendants Easter and Johnson urged the Board of Trustees to

terminate Plaintiff related to his attempt to disseminate details regarding improprieties in the student election process and actions taken by Defendants to cover up the same.

Defendants' sham process proceeded when it ignored the findings of the CAFT panel that after numerous hearings and consideration of substantial testimony had exonerated Plaintiff and instead proceeded to institute revocation proceedings before the Board of Trustees based on all charges including every charge CAFT had found to be deficient.  In violation of his duties under Article X, President Easter did not even provide the necessary response to why he failed to follow CAFT's recommendations.  Defendants' sham process was further highlighted when Defendant Clower chose to present to the Board of Trustees numerous charges that had not been considered by the CAFT panel but had rather been considered by the alternative forum that she and other Defendants had initially contrived as means to terminate Plaintiff.  Defendants then presented to the Board of Trustees numerous new charges that had not existed at the time of Plaintiff's CAFT hearings without giving Plaintiff the opportunity to first have these charges heard before a CAFT panel.  Instead, then CAFT chairman Johnson negotiated.  Defendants then failed to provide notice of these additional charges until shortly before the Plaintiff's hearing before the Board of Trustees.  At the "show hearing" before the Board of Trustees, Plaintiff then was given a mere 40 minutes to defend against more than sixty new charges raised.  In sum, Defendants' process was anything but "due".

Here, Plaintiff has plead facts to demonstrate that Defendants were not unbiased when they decided to terminate him for attempts to expose Defendants for their unethical actions. Rather, these same Defendants, including Defendants Clower and others, put the wheels in motion to terminate Plaintiff and proceeded to terminate him even after he was cleared in a CAFT hearing.  Defendants' actions constitute a sham process that revoked Plaintiff property

interest under the Fourteenth Amendment without due process.  See Levenstein v. Salafsky, 2002 WL 187595, *12 164 F.3d 345 (N.D. IL Feb. 6, 2002) ("Given that Levenstein vociferously challenged Salafsky on what he believed to be fiscal mal/misfeasance at Rockford, the evidence allows Levenstein to pursue his claim that defendants were biased. Salafsky's recommendation to Broski, which set the wheels in motion on the road to Levenstein's termination")

For the foregoing reasons, Plaintiff has sufficiently pled that Defendants violated his Fourteenth Amendment rights and, therefore, Defendants' Motion to dismiss Count II must be denied.

> **f.**  **The Individual Defendants Are Not Entitled to Qualified Immunity Under Count II of Plaintiff's Complaint Claiming Violation of His Fourteenth Amendment Rights.**

In those circumstances in which qualified immunity is assessed pre-trial, courts follow the "Supreme Court's admonition that in determining the immunity issue prior to trial, the facts must be "taken in the light most favorable to the party asserting the injury." Doe v. Board of Trustees of University of Illinois, 429 F.Supp.2d 930, 944 (2006) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)

Once the public official raises the defense of qualified immunity, the plaintiff bears the burden of showing (1) whether he or she has asserted a violation of a constitutional right, and (2) whether the applicable constitutional standards were clearly established at the time in question. Khuans v. School Dist. 110, 123 F.3d 1010, 1013 (7th Cir.1997)

In the instant case, Plaintiff has alleged that he had a protected property interest as a tenured professor and that Defendants' denied him due process in taking his property interest through a sham process.  Analysis of the applicable constitutional standards and

Defendants' unreasonable violations of the same have been detailed by the Seventh Circuit in

<u>Levenstein</u>:

> University officials knew that they could not offer only a phony opportunity to contest charges. In their briefs they dispute this characterization of their actions as a matter of fact, but this is not the time for either them or us to engage in that debate. At this stage, therefore, Levenstein has alleged enough to survive dismissal of his procedural due process claims on qualified immunity grounds.

> <u>Levenstein v. Salafsky</u>, 164 F.3d 345, 351 (7th Cir. 1998)

Here, Plaintiff has alleged numerous examples of how Defendants process was "sham" in nature.  Like the defendants in Levenstein, Defendants knew that a phony process was insufficient for Plaintiff to contest the charges against him.

For the foregoing reasons, Plaintiff has sufficiently pled a Fourteenth Amendment violation against Defendants and Defendants' summary judgment motion must be denied.


STUART D. POLIZZI

<u>/S/ Stuart D. Polizzi</u>
2442 Waupaca Ct.
Naperville, IL 60564
PH: (708) 476-6852

## <u>CERTIFICATE BY COUNSEL</u>

The "argument" section of the foregoing instrument does not comply with the type volume limit of Local Rule 7.1(B)(4). Motion for leave to file a non-conforming document has been filed. The "argument" section of the foregoing instrument is in proportional type, and is 33 pages in length, contains 8,571 words, and 55,875 characters (with spaces) as determined by the word processing system used to prepare this document.

<u>/S/ Stuart D. Polizzi</u>
STUART D. POLIZZI

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2018, I caused the foregoing **RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** to the filed with the Clerk of the Court using the Court's CM/ECF filing system, which will send notification to the following counsel of record:

William S. Brinkmann
Thomas, Mamer & Haughey, LLP
30 E. Main'
Champaign, IL 61824-0560
wjbrinkkm@tmh-law.com

**/s/ Stuart D. Polizzi**